# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**CHARLES DAVID CUMMINS**                                    **CIVIL ACTION**

**VERSUS**

**UNUMPROVIDENT INSURANCE CO.,**                    **NO. 04-339-A-M2**
**ET AL**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 10 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 10 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in chambers in Baton Rouge, Louisiana, August 23, 2007.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CHARLES DAVID CUMMINS                                   CIVIL ACTION

VERSUS

UNUMPROVIDENT INSURANCE CO.,                            NO. 04-339-A-M2
ET AL

<u>MAGISTRATE JUDGE'S REPORT</u>

This matter is before the Court on the Cross-Motion for Final Judgment on the Merits of the Case (R. Doc. 72) filed by defendant, Unum Life Insurance Company ("Unum"), and the Motion for Summary Judgment on the Merits (R. Doc. 76) filed by plaintiff, Charles David Cummins ("Cummins").

<u>PROCEDURAL BACKGROUND & SUMMARY OF ADMINISTRATIVE RECORD</u>

This lawsuit involves a claim by Cummins for long-term disability benefits ("LTD") under a group insurance policy issued by Unum to Cummins' employer, Ferro Corporation. The parties to this matter have stipulated that the group insurance policy at issue is part of an employee welfare benefit plan governed by ERISA.  Cummins first applied for LTD on July 15, 2002, at which time he indicated that he had been unable to work since February 5, 2002 because of "cognitive decline secondary to HIV."  *See*, UPCL 00311 (R. Doc. 28). He stated that his first symptoms included fatigue, weakness, chronic diarrhea, and "difficulties in completing tasks due to deficiencies in concentration, persistence or pace," and he noted that his treating physicians were Dr. James Osterberger, Jr. and Dr. John Bolter. *Id*.

With his July 15, 2002 application for LTD, Cummins submitted a Physician's Statement by Dr. Osterberger dated July 13, 2002, wherein he opined that Cummins had

1

a primary diagnosis of HIV infection with associated cognitive deficits.  UPCL 00306-00307.
Dr. Osterberger noted that Cummins exhibited symptoms of memory and cognitive problems, which first appeared in January 2002, and that he first saw Cummins on January 22, 2002. *Id.*

Cummins also submitted a Physician's Statement dated July 31, 2002 by Dr. Bolter, which included a primary diagnosis of cognitive decline secondary to HIV.  UPCL00199-UPCL00200.  Dr. Bolter noted symptoms of fatigue, chronic diarrhea, poor persistence and vigilance, memory problems, low tolerance for stress, nervousness, and apprehension and that Cummins had undergone a neuropsychological evaluation on February 26, 2002.  Dr. Bolter further noted that Cummins told him his symptoms first appeared on February 1, 2001, and he began seeing Cummins on February 4, 2002.  Dr. Bolter also indicated that Cummins was unable to tolerate the demands of work/competitive employment secondary to his poor tolerance for stress, poor persistence, memory loss, and excessive emotional turmoil accompanying work responsibilities.  *Id.*

A report from the Neuropsychological Evaluation performed by Dr. Bolter on February 26, 2002 was also submitted with Cummins' application for LTD.  According to the report, the evaluation revealed findings consistent with a pattern of neurocognitive dysfunction characteristic of HIV-associated cognitive/motor symptoms.  Specifically, Dr. Bolter found that Cummins was exhibiting problems with impaired attention and concentration, mental slowing, difficulties with acquisition of new material, and general loss in intellectual efficiency.  He also noted that Cummins was "clearly showing problems with emotional instability" and had a "marked degree of depression and anxiety, which [was] both interfering with his ability to function from day to day as well as his ability to tolerate

even routine stresses."  Dr. Bolter indicated it was "difficult to articulate to what extent things would improve from a cognitive perspective if [Cummins'] depression and anxiety were under better control, but at [that] point there is a high probability that he is manifesting HIV cognitive-related changes."  *Id.*  He recommended more aggressive treatment for Cummins' depression using a dual system antidepressant and individual psychotherapy.

On October 7, 2002, Dr. Jana Zimmerman, an Unum in-house, licensed psychologist,  conducted a "pre-existing medical review" of Cummins' file.  UPCL 00101. Dr. Zimmerman noted that the primary and secondary conditions for which Cummins was seeking LTD were cognitive impairment secondary to HIV and depression respectively. She also determined that Cummins had received treatment, consultation, care or services during the pre-existing time frame, in that he was involved in an HIV drug study group from June 1997 to February 2002 and that he had received Zoloft, an antidepressant, for depression in April 2001, May 2001, and June 2001 per pharmacy records, during a January 1999 hospitalization, and per April 2000 office visit notes.  *Id.*  She further concluded that the "available medical records" indicated that Cummins' present condition of cognitive impairment was secondary to his HIV.[1] [2]

After reviewing the above documentation, Unum sent correspondence to Cummins

---

[1] As the rationale and supporting evidence for her conclusion, Dr. Zimmerman referred to medical records wherein Cummins reported to his health care providers that he was diagnosed as HIV+ in 1997 and had been taking antiviral drugs as part of a drug study since June or July 1997.  She noted that cognitive changes secondary to Cummins' HIV+ condition were evidenced in the documentation, including a January 8, 2002 performance appraisal by his employer and the neuropsychological evaluation performed by Dr. Bolter.  *Id.*

[2] Cummins' file was also reviewed by Dr. Lani Graham, a family practice physician employed by Unum, on October 24, 2002.  She reached essentially the same conclusions as Dr. Zimmerman, *i.e.*, that HIV infection was the cause of Cummins' cognitive decline and that Cummins received treatment for that condition during the pre-ex period as part of a "study group" for treatment of HIV infection.  UPCL 378-79.

on October 25, 2002, wherein it denied his claim for LTD on the ground that such claim was excluded from coverage under the policy's "pre-existing condition" provision.  UPCL 00361-00364.  Such "pre-existing condition" exclusion provision provides the following:

> This policy will not cover any disability:
>
> 1.      Caused by, contributed to by, or resulting from a pre-existing condition; and
>
> 2.      Which begins in the first 12 months after an insured's effective date.
>
> A "pre-existing condition" means a sickness or injury for which the insured received medical treatment, consultation, care or services including diagnostic measures, or had taken prescribed drugs or medicines in the three months prior to the insured's effective date.

*Id.*; *See also*, UPCL 00213.  In that letter, Unum explained that the effective date for Cummins' policy was June 4, 2001,[3] and the time frame for the "pre-existing period" was therefore the three (3) month period from March 4, 2001 to June 4, 2001.  Unum further explained that the medical information it had received at that time, including Cummins' claim form, Dr. Osterberger's Physician Statement, and the Neuropsychological Evaluation by Dr. Bolter, indicated that Cummins' disability was due to cognitive problems secondary to his HIV and that there had not been any information provided showing that the cognitive problems were due to some other cause than HIV or depression.  *Id.*[4]

_____

[3] The effective date under Cummins' policy is undisputed, as his date of hire was December 4, 2000 (UPCL 00233), and the policy had a six (6) month waiting period (UPCL 00224).  Accordingly, the effective date of Cummins' coverage under the LTD plan was June 4, 2001.

[4] Specifically, Unum explained that its investigation revealed that Cummins had been part of "study group" for the treatment of HIV from May 1997 to January 28, 2002, and as part of that "study group," he received medications, including Indinavir, a known anti-viral used for control of HIV infection, which he was instructed to take on a daily basis even during the "pre-existing period."  Unum further pointed out that, when Cummins was seen on May 17, 2001, it was apparent that he had taken 80 to 100% of the medications, and tests were performed to assess the status of his HIV infection, at which time

By correspondence dated February 21, 2003, Cummins requested an appeal on the ground that, since Unum's decision to deny benefits, he had obtained documentation which contradicted that decision. UPCL00099. Specifically, Cummins referred to two letters, one by Dr. Steven J. Zuckerman, a neurologist, and the other by Dr. Bolter. Dr. Zuckerman's February 6, 2003 letter includes an opinion that Cummins' organic dementia was not due to his HIV status because the onset of his cognitive problems was during a time when his HIV titers had remained extremely stable, and while Cummins was experiencing depression, such depression was not the "root cause" of his dementia, which was "likely degenerative and idiopathic in nature." UPCL00097. Dr. Bolter's letter, dated February 12, 2003, stated that the onset of Cummins' cognitive problems appeared to be "independent of his HIV infection" and indicated that the etiology of Cummins' cognitive decline did not appear to be directly related to depression either, as his depression was resolving in response to his medication and follow-up psychotherapy. Dr. Bolter concluded that the etiology of Cummins' apparent cognitive decline was related to a degenerative process. UPCL00095.

Considering those letters from Dr. Zuckerman and Dr. Bolter, Unum had another in-house neuropsychologist, Dr. Steven Van De Mark, conduct a "pre-existing medical review" of Cummins' file on March 25, 2003. UPCL00078-81. Dr. Van De Mark reviewed those letters as well as an OSP medical file review conducted by Dr. Lawrence Broda on March 11, 2003, wherein Dr. Broda opined it was unlikely Cummins had dementia due to his HIV status. Dr. Van De Mark also reviewed therapy notes from Dr. Bolter, which indicated

---

additional anti-viral medications were issued. Finally, Unum indicated that pharmacy records revealed that Cummins had been prescribed Zoloft on April 7, 2001 and May 7, 2001. *Id*.

treatment for both cognitive and depression issues, and the raw test data from Dr. Bolter's 2002 neuropsychological evaluation.  Dr. Van De Mark found that Cummins had been treated for depression with the prescribed antidepressant Zoloft in April to June 2001 per the pharmacy records and that depression had been documented in Cummins' January 1999 hospitalization records and a April 2000 office note.  Dr. Van De Mark also noted Dr. Bolter's comments regarding Cummins' multiple symptoms associated with depression, and Cummins' MMPI-2 test scores that indicated an extreme degree of elevation for depression and anxiety,[5] which is "certain to affect the cognitive functions of sustained attention, retention of new learning, and information processing speed and to distract and preoccupy [ ] Cummins with regard to the competent performance of his occupation as a chemical engineer."  Based upon that information, Dr. Van De Mark concluded that Cummins' claimed disabling condition was caused by, contributed to by, or resulted from a condition treated during the "pre-ex period."  *Id.*

In his review, Dr. Van De Mark also discussed the fact that Dr. Broda, Dr. Bolter and Dr. Zuckerman had not offered any rationale for their change of opinion as to the cause or etiology of Cummins' symptoms of depression and cognitive difficulties.  He referenced the

---

[5] Specifically, with regard to such test data, Dr. Van De Mark noted that the data evidenced some inconsistencies.  For example, on his CVLT-2 test, Cummins showed that his ability to recognize previously recalled information is less efficient than his ability to recall that information after a delay, which is the opposite of what is usually found.  Dr. Van De Mark also noted that, on the MMPI-2 test, Cummins evidenced an "extremely elevated clinical profile on scales relating to hypochondriasis, depression, hysteria and psychasthenia, which was noted as a "very unusual degree of elevation" that statistically occurs in less than one-half of 1% of the general population, indicating gross symptom exaggeration and magnification of psychological distress by Cummins.  Considering the test scores for the cognitive results, which indicated problems mostly in the borderline to mild range of impairment in light of the MMPI-2 test results, Dr. Van De Mark found it was "likely the difficulties that [ ] Cummins [was] showing with regard to information processing and memory functions [were] related to both psychological distress in the form of depression and anxiety, and to symptom exaggeration and magnification.  He found that, since Dr. Bolter did not administer any independent assessments for symptom validity, the extent to which Cummins may have exaggerated his symptomatology was not independently known but was substantial.

fact that Dr. Bolter identified a serious head trauma, which Cummins sustained as a child when he struck his head during a swinging accident, as the cause of Cummins' present symptoms;[6] however, Dr. Van De Mark discredited that opinion on the ground that Cummins had received his education and apparently had been able to function in his occupation quite well after the childhood head trauma up until after he was diagnosed as HIV+.  UPCL00079.  Dr. Van De Mark found it likely that Cummins' cognitive complaints would improve if there were better control of his depression and anxiety.  *Id.*

Following Dr. Van De Mark's review, Unum notified Cummins by letter dated April 4, 2003 that the decision to deny his claim for benefits based upon the "prexisting condition" exclusion provision was appropriate.  UPCL00074-77.  Unum explained the "pre-existing condition" provision and notified Cummins that it was denying his claim because the records indicated that he had received treatment and took prescription medication for HIV and depression during the "pre-ex" period.  Unum pointed out that, although Cummins' treating physicians indicated in their most recent letters that his cognitive deficit was independent of his HIV status, those physicians had not offered any supporting, objective data for the change in their opinions, as they had previously indicated that Cummins' cognitive problems were related to his HIV status.  Unum further explained that, while its on-site internist had likewise determined that Cummins' cognitive problems were not likely a result of his physical HIV complications, its on-site neuropsychologist had determined that such problems were a result of depression, for which Cummins had been treated during the "pre-ex" period.  UPCL00075.

---

[6] Dr. Bolter noted that a recent MRI, which demonstrated "five cysts" in the right posterior region of the brain, were "evidently related to [Cummins'] earlier trauma."  UPCL00079.

On May 6, 2003, Cummins submitted to Unum a timeline of his conditions and treatment from December 4, 2000, when he was employed by Ferro, to April 14, 2003, as well as another letter from Dr. Bolter to Dr. Zuckerman dated May 5, 2003.  UPCL00033-63.  In that letter, Dr. Bolter indicated that he "had concern about" several issues raised in Unum's April 4, 2003 denial letter.  Specifically, Dr. Bolter indicated that he was concerned about the issue of Cummins' depression and what role it plays in his clinical presentation of memory loss and other cognitive difficulties.  UPCL00060.  He noted that he felt Cummins' depression had been "lifting up" until the time of Unum's recent denial of LTD. *Id.*  He also indicated that he could not re-evaluate Cummins at that time out of concern that his mood would be a major factor in the interpretative value of testing, and if Cummins "[came] out impaired and the depression scale [ ] elevated" in his test results, it would be looked upon as a validation that his depression was the reason for his problems.  Dr. Bolter therefore indicated that he wanted Cummins to be stabilized for a longer period of time before he re-evaluated him.  *Id.*

Dr. Bolter also posed his alternative explanation for Cummins' neurological deficits for Dr. Zuckerman's consideration.  He noted that he had reviewed Cummins' August 2001 brain MRI, which had been interpreted as suggesting a "characteristically longstanding cystic encephalomalacia."  He also explained that Cummins' had reported a "very severe closed head injury" as a young child, and Dr. Bolter concluded that the "apparent changes on his MRI may reflect that childhood injury."  Dr. Bolter found it "possible" that Cummins' cognitive impairments were actually "early aging effects as a result of his very severe head injury as a young child," and while the head injury was pre-existing, it was not pre-existing under the LTD policy exclusion.  Dr. Bolter hypothesized that Cummins may have been

8

functioning normally when he was hired by Ferro, and it was only after he had been working at the company for a period of time that the stress of his job began to erode his ability to deal with work demands, precipitating his cognitive decline.  UPCL00059.

Considering Dr. Bolter's hypothesis, Unum requested that Dr. Van De Mark review Cummins' file again on May 13, 2003.  Dr. Van De Mark referred the file to another on-site neurologist, Dr. Alan Neuren, who reviewed the file on June 2, 2003.  UPCL00026-28.  Dr. Neuren concluded that there "may be several factors contributing to the insured's presentation," all of which were clearly pre-existing.  UPCL00027.  Specifically, he noted that Cummins had been diagnosed with organic brain syndrome by Dr. Fein in 1999, and Dr. Neuren felt that such diagnosis was multifactorial, probably resulting from Cummins' old head injury with associated structural abnormalities, the presence of HIV, his history of alcohol abuse, and underlying characterological problems, including depression and anxiety.  Considering all of those conditions, Dr. Neuren found there was "no basis for Dr. Zuckerman's contention that the insured ha[d] idiopathic dementia."  *Id.*  Dr. Neuren also found that Cummins had been manifesting difficulties with cognition, emotional instability, and depression both before and during the "pre-ex" time frame and concluded that Dr. Bolter's "alternative explanation" for Cummins' problems as a manifestation of early effects of aging superimposed on the old head injury was "purely conjectural and generally inconsistent with the mechanism of head trauma."  *Id.*[7]  Finally, Dr. Neuren concluded that

---

[7] Specifically, Dr. Neuren pointed out that Dr. Bolter's contention that Cummins had been functioning well upon employment with Ferro lacked support since Dr. Fein had diagnosed the claimant with organic brain syndrome in 1999, and the contention that stress would provoke cognitive decline was also labeled by Dr. Neuren as "speculative."  Dr. Neuren explained that the old head injury had "probably contributed to some of the insured's cognitive problems; however[,] the condition ha[d] been static and [was] not progressive."  *Id.*  He also noted that the presence of that type of abnormality would have resulted in "some degree of left-sided motor impairment as well as alteration of visual-spatial perceptions

"there [was] nothing in the information provided that would indicate that the insured's difficulties are a consequence of any condition which occurred after the pre-ex time frame." UPCL00026.

On June 6, 2003, Unum notified Cummins that the second appellate review of his claim had been completed and that the decision to deny benefits based upon his pre-existing condition would again be upheld. UPCL00024-25. Unum explained Dr. Neuren's conclusions and noted Dr. Zuckerman's opinion that Cummins had idiopathic dementia lacked any basis given the presence of Cummins' various conditions of HIV, depression and anxiety. *Id.*

On August 18, 2003, Cummins' wife contacted Unum and asked if Unum had received a letter from Dr. Zuckerman dated July 10, 2003, which had been faxed to Unum. Although Unum's June 6, 2003 denial letter informed Cummins that he had exhausted all of his administrative remedies, Unum agreed to re-open Cummins' case and have Dr. Zuckerman's letter reviewed by Dr. Neuren as a re-appeal. UPCL00001. On August 20, 2003, Dr. Neuren reviewed Dr. Zuckerman's letter, which indicated that Cummins had undergone a repeat MRI with findings that remained stable since his previous MRI of August 2001 and that he suspected the employee had a primarily degenerative neurological disorder presenting with primary progressive aphasia. UPCL00003-5. Dr. Neuren found Dr. Zuckerman's opinion that Cummins' dementia commenced in 2002 was inconsistent with the medical records in Cummins' file. Specifically, Dr. Neuren pointed out that the past medical records "clearly document[ed] the onset and treatment of cognitive

---

and processing," and would have been "long standing problems with which the insured [would have] been functioning for years." UPCL00026-27.

problems before and during the pre-ex time frame."  UPCL0003.

On August 25, 2003, Unum sent correspondence to Cummins again advising that it would uphold the denial of LTD benefits based upon the "pre-existing exclusion" provision in the policy.  UPCL00009-10.  The letter discussed Dr. Neuren's review of Dr. Zuckerman's most recent letter and concluded that, while there may be several factors contributing to Cummins' presentation of symptoms, all of those factors were treated during the "pre-ex" period and not covered under the terms of his policy.  *Id.*

Cummins then filed the present lawsuit on May 24, 2004.  R. Doc. 1.  On January 18, 2005, Unum advised Cummins that his claim was one which was eligible for reassessment under a Regulatory Settlement Agreement entered into by Unum with multiple state insurance regulators, and Cummins elected to participate in that claim reassessment process and filed a motion to stay this litigation while Unum reassessed his claim.  *See*, Motion to Stay filed on March 8, 2005, R. Doc. 48.  On February 4, 2006, Cummins submitted additional data for Unum to consider during the claim reassessment process, including updated medical records from Dr. Bolter, Dr. Zuckerman, and Dr. Osterberger and a notice of social security disability benefits.  UPCL-POST RSA-00438-439.  In a letter enclosing this new information, Cummins' counsel contends that the new documents show that Cummins' physicians have "now definitively distinguished his cognitive difficulties from his depressive symptoms and are attributing the former to his traumatic brain injury," which is "well documented in his MRIs performed in 2001, 2003 and 2004."  *Id.*  Cummins' counsel contends that the traumatic brain injury clearly is not a pre-existing condition within the definition of UNUM's policy.  *Id.*

Dr. Zuckerman's updated records include another letter dated April 17, 2004, which

11

provides an "interval report" on Cummins' condition.  In that report, Dr. Zuckerman states that Cummins was still experiencing several neurological problems, including complaints of progressive weakness of his left side with atrophy and significant cognitive disturbances which "only became apparent in the year 2002."  UPCL-POST RSA-00324.  Dr. Zuckerman notes that there is "no definitive diagnosis regarding the cause of [Cummins'] cognitive disturbance;" however, he finds no indication of any HIV or other infectious etiology which could potentially cause his problems.  Dr. Zuckerman further notes that he performed a nerve conduction study and EMG in order to rule out any peripheral nerve or muscle disorder, both of which were normal.  In conclusion, Dr. Zuckerman opines that Cummins' clinical history and his radiographic and electrical study findings are consistent with "a neurodegenerative disorder with onset in 2002," with "some localization of cystic encephalomalacia," which renders Cummins "totally disabled."  *Id.*

Dr. Bolter's updated medical records include progress notes from his various visits with Cummins since Dr. Bolter's last letter of May 5, 2003, discussed above.  From those records, it appears that Dr. Bolter continued to see Cummins on a near monthly basis from May 2003 to July 2004.  Then, Cummins ceased treatment with Dr. Bolter during the period of July 2004 to June 2005 and resumed treatment again on a near monthly basis from June 2005 to May 10, 2006.  UPCL-POST RSA 00039-114.  During that time, Dr. Bolter, treated Cummins with "cognitive behavioral therapy to help him deal with depression" and psychological adjustment issues, and Cummins was prescribed Zanax for his depression and Seroquel for sleep difficulties.  UPCL-POST RSA 00039-114.

On March 9, 2004, Dr. Bolter conducted another Neuropsychological Evaluation of Cummins.  UPCL-POST RSA 00078-83.  In a letter to Dr. Zuckerman summarizing such

evaluation, Dr. Bolter noted that, in the two years since his last neuropsychological testing, Cummins had shown "significant problems with recurrent depression, which appeared to be "really exacerbated following the denial from his long-term disability insurance company." Dr. Bolter had worked to try and stabilize Cummins' mood and had "seen him show some progress and movement in that direction." However, Dr. Bolter noted that Cummins remained "fairly brittle and . . . can easily trip into a more acute, depressive syndrome, even in the presence of minor provocation associated with normal familial stress."[8] While Cummins was found to be "much less depressed and seem[ed] to be on the rebound emotionally with regard to what was evident two years [before]," his "persistent cognitive deficits" were sufficient to interfere with his capacity to engage in gainful employment. Dr. Bolter noted that the cause of such cognitive deficits was "unknown" but that it was heartening to see that Cummins was not showing a substantial decline in cognitive ability. Finally, he concluded that, because Cummins' memory acquisition test results had declined since 2002, there may be additional problems in the future which will require treatment. UPCL-POST RSA 00078-83.[9]

---

[8] During the evaluation, Cummins underwent a comprehensive battery of tests over two days, which revealed that his intellectual functioning, IQ, and achievement testing had substantially improved since his February 2002 tests. His motor functions demonstrated a right-sided dominance and substantial difficulties with fine motor dexterity and strength on his left, non-dominant side, which was the side with the parietal lesion evident on his MRI. As to attention/concentration, Cummins showed improvement from 2002 in the area of omission errors but demonstrated problems in the areas of vigilance, persistence, and auditory and visual attention. Cummins' language functions appeared to be within normal range, although he did exhibit a mild residual word finding problem, and he demonstrated a normal capacity with respect to visuospatial/constructional skills. With respect to memory and learning ability, Dr. Bolter found that Cummins had difficulties with encoding new material and retaining that material unless he has had an opportunity for significant repetitive learning.

[9] On April 7, 2004, Dr. Bolter explained the results of the neuropsychological tests to Cummins. Specifically, he noted that such tests reflected improvement in Cummins' "affective functioning," meaning, his depression was under "greater control and not producing a more generalized depressive effect." However, Cummins still had persistent deficits which were characteristic of an underlying dysfunction, which Dr. Bolter felt "may very well be a progressive decline with advancing age." UPCL-POST RSA

As of September 29, 2005, Dr. Bolter issued an official differential diagnosis of major depressive disorder, moderate severity, recurrent; cognitive disorder secondary to traumatic brain injury and systemic illness; and substance abuse disorder, in remission. UPCL-POST RSA-00106-107.  In his last office notes dated January 10, 2006 and May 10, 2006, Dr. Bolter indicated that he believes Cummins suffers from an "organic mental disorder" and is qualified for long-term disability because he cannot engage in meaningful work without substantial regression.  UPCL-POST RSA-00113-114.

On May 23, 2006, Unum obtained an independent review of Cummins' file by Dr. Dianne Wolf, a psychiatrist and neurologist.  UPCL-POST RSA-000154-157.  In reviewing the file, Dr. Wolf found no mention of "cognitive decline" in the medical records during the "pre-ex" period.  She noted that Cummins had been seen by Dr. Lutz pertaining to his AIDS condition in May 15, 2001 and was found to be normal except for prominent tensions in his left hand.  She also noted that Cummins was seen by his internist on August 20, 2001, but he did not express any memory concerns.  *Id.*  An MRI of the brain was ordered at that time, and Cummins was referred to a neurologist.  However, no records were made available to Dr. Wolf from any neurologist that saw Cummins during 2001.  Dr. Wolf also noted that, while Cummins took Zoloft during the pre-ex period, she did not think that was a factor in causing his cognitive decline.  *Id.*

Dr. Wolf also opined that the medical evidence did not support the hypothesis that Cummins' cognitive problems were caused by or contributed to by a traumatic brain

─────────────────

00085-86.

injury.[10]  Finally, Dr. Wolf indicated that she was unable to determine whether Cummins'

cognitive problems were caused by or contributed to by his HIV because it was beyond her

area of expertise; however, from her neurologist perspective, she opined that it was unlikely

that Cummins' dementia was due to his being HIV+.  *Id.*

Considering Dr. Wolf's conclusions, on July 12, 2006, Unum had its in-house clinical

neuropsychologist, Dr. Malcolm Spica, review Cummins' file, examine the raw data from

Dr. Bolter's 2002 neuropsychological evaluation and compare that evaluation to the 2004

neuropsychological evaluations.   UPCL-POST RSA-00028-31.   Dr. Spica found it

reasonable to conclude that Cummins' cognitive complaints were influenced by his

documented depression and symptom exaggeration.[11]  He specifically pointed out that,

---

[10] She pointed out that the records did not reflect any post-traumatic dementia occurring acutely after the head injury, and since there was mention of only one head injury, she did not see that injury as being the cause of Cummins' later decline.  She explained that repeated cerebral injuries many years after the last injury, such as boxers would sustain, could cause dementia and other neurological signs and symptoms; however, such was not the case with Cummins.  *Id.*

[11] Specifically, Spica noted that, in reviewing Dr. Bolter's raw testing data from the February 2002 examination, it was evident that Cummins had a "Fake Bad Scale score on the Minnesota Multiphasic Personality Inventory, which was "far beyond the cut off for credible responding, and into the range associated with malingering."  Furthermore, severe emotional distress was noted during the 2/02 examination, with extreme elevations on scales pertaining to depression (>99th percentile), hysteria (>99th percentile), and hypochondriasis (>99th percentile).  Based on this date, Spica concluded that Cummins' neurocognitive weaknesses were due to "combined factors of emotional distress and symptom exaggeration."

Although Dr. Bolter did not provide the raw data from his 3/04 examinatin, Spica noted that Cummins' score on the depression index ranked in the 96th percentile, and his score remained elevated for Conversion Hysteria (>99th percentile) – findings which were contrary to Dr. Bolter's statements that, "clearly, emotional factors are not longer intruding to his persistent cognitive problems noted above."

Spica also made note of information from Dr. Fein's records, which had not been previously noted by any of Unum's reviewing health care providers.  He noted that Cummins and his wife consulted Dr. Fein, a psychologist, on February 23, 1999, and according to a summary letter by Dr. Fein to Dr. Gerald Hientz, Cummins exhibited multiple characterological problems including "manipulation by dominance oriented behavior," physical abuse of his wife, alcohol abuse, police arrest for solicitation of prostitution, police arrest for disorderly conduct, and disproportionate states of anger/rage.  Dr. Fein suggested ruling out organic causes for Cummins' behaviors and diagnosed an Axis II personality disorder of Mixed Personality Disorder with Narcissistic, Histrionic and Obsessive-Compulsive traits.  Spica found that Dr. Fein's impression, along with the MMP1-2 Fake Bad Scale of 35 raised the "probability that Cummins

during Cummins' February 2004 neuropsychological examination, he demonstrated "some improvement in his cognition, commensurate with his improvement in depression (MMP1-2 Depression scale remained in the significant range)." He concluded that it was also reasonable to conclude that Cummins was treated during the pre-ex period for depression which contributed to Cummins' experience of cognitive dysfunction, based upon records reflecting that he was prescribed Zoloft in 4/01, 5/01, and 6/01. Considering Dr. Spica's conclusions, Unum sent another letter to Cummins on October 10, 2006, advising him that the previous denial of his LTD claim was appropriate. UPCL-POST RSA-00009-00015.

## **LAW & ANALYSIS**

As noted above, the parties have stipulated that the group insurance policy at issue is part of an employee welfare benefit plan governed by ERISA. It is also undisputed that the policy at issue vests Unum with discretionary authority to determine eligibility for benefits and to interpret the provisions of its policy in making benefit determinations. UPCL 00501. Under an ERISA plan, an administrator's denial of benefits is "reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," under which circumstances an abuse of discretion standard of review applies. *Lain v. UNUM Life Ins. Co. of America*, 279 F.3d 337 (5th Cir. 2002); *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 599 (5th Cir. 1994)(The Fifth Circuit applies the abuse of discretion standard when reviewing factual determinations made by a plan administrator with discretionary authority). Furthermore, a court's review of factual determinations under the abuse of

---

engages in some impression management when presenting to his attending physicians."

16

discretion standard is limited to the administrative record, and a court may not open the record and conduct discovery as to these determinations. *Chapman v. Prudential Life Ins. Co. of America*, 267 F.Supp.2d 569 (E.D.La. 2003).[12]

When applying the abuse of discretion standard to an administrator's factual determinations, the Court analyzes whether the administrator acted arbitrarily or capriciously. *Id.* A decision is arbitrary when made "without a rational connection between the known facts and the decision or between the facts and the evidence." *Id.* A plan administrator's decision will be affirmed if it is supported by "substantial evidence." *Id.* "Substantial evidence" is "more than a mere scintilla . . . [i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* A court may not substitute its judgment for that of the plan administrator. *Id.* The abuse of discretion standard exists to "ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional." *Id.*

While the abuse of discretion standard sets a "relatively high bar" for the plaintiff to overcome, the Fifth Circuit Court of Appeals applies a "slide scale" standard of review in cases where the plan administrator is a "self-interested insurer" who serves as both the insurer and the administrator of the plan and stands to gain from a denial of the claim. *Id.*; *Vega v. National Life Ins. Servs., Inc.*, 188 F.3d 287, 287 (5th Cir. 1999)("The greater the

---

[12] The only exception in which a district court may allow discovery is when the plaintiff argues that additional evidence, such as an expert report, will assist the district court in understanding the medical terminology or practices relating to a claim. *Id.* at 577. However, this exception is inapplicable in the present case, because the Court finds that the medical opinions and treatment notes contained in the administrative record sufficiently explain Cummins' condition and enable the court to determine whether Unum abused its discretion.

17

evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be").  In other words, the existence of a conflict is a factor to be considered in determining whether the administrator abused its discretion in denying a claim, and the extent to which the scale slides depends upon the amount of evidence the plaintiff brings forward demonstrating a conflict of interest.  *Id.*  If there is no evidence of a conflict of interest or the only evidence is the fact that the plan administrator is also the insurer and has the authority to deny or approve claims, an administrator's decision is viewed only with "a modicum less deference" than the ordinary abuse of discretion standard.  *Id.; MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472 (5th Cir. 2003)(Where only a "minimal basis for a conflict" is established, "only a modicum less deference" than the ordinary abuse of discretion standard is applied).[13]  Under that standard, the basis for the administrator's decision must be supported by "some concrete evidence in the administrative record."  *Vega*, 188 F.3d at 302; *Robinson*, at 395.

In the present case, Cummins contends that Unum has an "intrinsic conflict of interest" because it is not the claimant's employer, and it is contractually obligated to pay benefits or is otherwise affected financially if the decision is favorable to the claimant. Cummins further contends that Unum has a conflict because, in making its benefits determination, it "relied extensively" on medical professionals who were not independent but who were, in fact, Unum officers and employees.[14]  However, it has been specifically

---

[13] In reality, even with this reduced abuse of discretion standard of review, a plaintiff is not in a much better position to defeat the administrator's findings since it is difficult to prove a conflict of interest beyond the inherent conflict of the "self-interested insurer" when the Court is confined to the evidence in the administrative record.  *Id.*

[14] Cummins has submitted copies of the curriculum vitae of Dr. Van de Mark, Dr. Neuren, and Dr. Zimmerman to demonstrate that they were employees or officers of Unum at

18

held that whether an administrator retains "in-house doctors" to review claims is irrelevant in the conflicts analysis. *Davis v. Unum Life Ins. of America*, 444 F.3d 569 (7th Cir. 2006). In fact, the neutrality of such physicians, even if employees of Unum, is presumed "unless the claimant shows, by providing specific evidence of actual bias, that there is a significant conflict." *Id.*; *Kobs v. United Wis. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005)(quoting *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998). The only evidence Cummins has produced in this regard demonstrates that the physicians upon which Unum relied were its employees. Cummins has not presented any evidence demonstrating that such doctors had some specific stake in the outcome of Cummins' case, such as higher payment if Cummins' claim was denied. *Davis*, at 575 (Proof of use of in-house doctors alone is not enough to show bias; instead, the claimant must show that the doctors had some specific stake in the outcome such as being paid more if the claims were denied). Considering that Cummins has not produced any competent evidence that Unum's "in-house" doctors had any "specific incentive to derail his claim," the Court finds no reason to further alter or diminish the abuse of discretion standard of review. *Id.*[15] [16]

_____

the time of their evaluations of Cummins.

   [15] Essentially, in this argument, Cummins is merely theorizing that "in-house" doctors have an inherent conflict in every case, including his, and such a theoretical argument is not sufficient to alter or otherwise diminish the customary abuse of discretion standard. *Davis*, at 575-76. *See also, Mers*, 144 F.3d at 1020; *Rud v. Liberty Life Assur. Co. of Boston*, 438 F.3d 772, 777 (7th Cir. 2006)(claimant must "demonstrate the existence of a real and not merely notional conflict of interest").

   [16] In addition, a plan administrator is under no obligation to afford Cummins' treating physicians' opinions with any greater deference than a physician hired by it to conduct an investigation. *Chapman,* at 579.

Accordingly, because the only conflict which exists in this matter is the fact that Unum was both the insurer and the administrator of the plan at the time Cummins' benefits were denied, its decision will be viewed only with "a modicum less deference" than the ordinary abuse of discretion standard.[17]  Under this standard, then, the Court should uphold Unum's determination of the facts underlying its benefits decision so long as that determination is supported by "some concrete evidence in the administrative record." *Vega*, 188 F.3d at 302; *Robinson*, at 395.

However, before that determination can be made, the Court must first examine whether Unum's interpretation of the plan's terms was legally correct.  Although Unum asserts in its motion for summary judgment that Cummins is not challenging Unum's interpretation of any specific policy term, the Court disagrees.  In Cummins' summary judgment motion, he argues that Unum has confused the dates which are critical to his case, and in so doing, has misinterpreted the pre-existing condition provision.  Accordingly, the Court must first determine whether Unum gave a legally correct interpretation of the pre-ex provision before examining whether Unum's decision to deny benefits is sufficiently supported by the record.  The standard for reviewing the interpretation of a plan provision made by an administrator, if the plan grants it the authority to make final and conclusive determinations of the claim, is the abuse of discretion or "arbitrary and capricious

---

[17] *See also, Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329 (5th Cir. 2001)(where the Fifth Circuit found a claimant's argument, that the administrator should have ordered an independent medical examination since the administrator's in-house physician was a hired consultant and did not have an opportunity to examine the claimant, was without merit where the plan did not require that claimants be examined prior to the denial of their claims); *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)(finding that the administrator of a disability plan did not abuse its discretion by denying a claim after reviewing the claimant's hospital records, and having its physicians, who were not specialists, review the claim).  The ERISA plan at issue in the present case similarly did not require that Unum obtain an independent medical examination of Cummins prior to denying benefits; nevertheless, Unum obtained one by Dr. Wolf.  UPCL 00206.

standard." *Duhon v. Texaco, Inc.*, 15 F.3d 1302 (5th Cir. 1994); *Chapman*, at 576.

In Cummins' argument regarding Unum's alleged misinterpretation of the "pre-ex provision," he notes that there are two distinct time periods provided for in the "pre-ex provision" which must be considered.  First, the provision only comes into play if the employee alleges that he became disabled during the first twelve (12) months following the effective date of his Unum insurance (June 4, 2001 - June 3, 2002), and second, if that occurs, Unum must look back to the three (3) months before the effective date (March 4, 2001 - June 3, 2001) to determine whether Cummins had a condition for which he was treated and which contributed to his disabling condition.  Cummins contends that Unum misinterpreted the provision because, in determining whether Cummins had "a condition for which he was treated and which contributed to his disabling condition," Unum relied upon medical evidence from the twelve month period after the effective date of the plan rather than evidence from the three month period before the effective date.  Specifically, Cummins makes reference to Unum's reliance upon Dr. Bolter's February 2002 neuropsychological evaluation and office notes in May 2002 as evidence that Cummins remained on medications for treatment of his HIV and for depression.  Cummins contends that whatever his condition was and whatever treatment he received in 2002 is irrelevant to determining whether he had a "pre-ex" condition because such information is derived from outside the relevant three month "pre-ex" period.

While it may be true that Unum made references to Cummins' condition and treatment during the twelve (12) month period after the effective date as evidence that Cummins had a pre-existing condition, the Court finds that Unum also relied upon evidence from within the three (3) month period before the effective date to make its determination

21

and thus did not misinterpret the policy.  For example, Unum, on several occasions, specifically referred to pharmacy records which reflected that Cummins was prescribed Zoloft, an antidepressant, in April 2001, May 2001, and June 2001.  Such dates are within the three (3) month "pre-ex" period and indicate that Cummins was receiving medication, which Unum contends was used to treat a pre-existing condition of depression and which contributed to the disabling condition for which Cummins is claiming benefits, cognitive decline.   Thus, it appears that Unum and Cummins share the same interpretation of the "pre ex" provision, and the issue is whether or not there is sufficient evidence in the record to support Unum's decision that Cummins is not entitled to benefits given that provision.

Both parties now agree that Cummins' condition of being HIV+ does not constitute a pre-existing condition which caused or contributed to his alleged disabling condition of cognitive decline.[18]  Instead, the issue is whether there is sufficient evidence to support Unum's conclusion that Cummins' had a pre-existing condition of depression during the three month pre-ex period which caused or contributed to his disability of cognitive decline.[19]  As noted above, as evidence that Cummins was treated for depression during

---

[18] *See*, p. 3 and 28 of Unum's memorandum in support of motion for summary judgment, citing UPCL 00084, 95, 96, UPCL POST RSA 00155 (where Unum concedes that, despite the treating physicians' initial opinions that HIV was the cause of Cummins' cognitive decline, Unum's in-house physicians, an independent medical provider, and Cummins' own treating physicians all later agreed that his HIV had not progressed to the point where it would cause cognitive deficiencies).

[19] Although Cummins presents an argument in his motion for summary judgment that this Court should not consider Unum's final benefits decision following the reassessment process, which occurred after this suit was filed, but instead should only consider Unum's earlier benefits decisions and reasoning, the Court agrees with Unum that Cummins waived any objection to the Court's consideration of Unum's reassessment decision when he failed to assert an opposition to Unum's motion to supplement the administrative record with information from the reassessment period and in fact requested that the Court grant a motion to include such information in the record.  *See*, Court's Order dated December 13, 2006, R. Doc. 56, where the Court instructed the parties to file briefs on the issue of whether Unum's benefits decision during the reassessment period should be the decision for review herein, and Cummins' response to the motion to supplement the administrative record, R. Doc. 64, wherein Cummins withdrew his previous objection to consideration of materials from the reassessment period and requested that the

the "pre-ex" time period, Unum refers to a pharmacy record which reflects that Cummins filled prescriptions for Zoloft during that time period and the reports of its various in-house physicians, which indicate that Zoloft is a medication used to treat depression.  Considering that Cummins filled his prescription for Zoloft on a monthly basis during the "pre-ex" period and the fact that none of Cummins' treating physicians ever indicated that Cummins would have been taking Zoloft during that period for any reason other than depression,[20] the Court finds there is sufficient evidence in the record that Cummins was treated for depression during the "pre-ex" period."[21] [22]

---

Court sign the order supplementing the record with such materials.  If Cummins wished to have the Court's Order reconsidered based upon the jurisprudence cited in its present summary judgment motion, it should have timely filed a motion for reconsideration of that Order within ten (10) days of being served with it as is required by Fed. R. Civ. P. 72(a).  Because Cummins did not timely submit such arguments to the Court, the benefits decision and reasoning by Unum which the Court will consider herein is Unum's October 10, 2006 decision following the claim reassessment period.

[20] Cummins' counsel makes much of the fact that there is no documented diagnosis of depression in the medical records or other information concerning Cummins' condition during the three month "pre-ex period;" however, the fact that there are no medical records from that time period does not mean that Cummins was not being treated for or taking prescribed medication for a "sickness" diagnosed outside the "pre-ex" period.  All that the "pre-existing" condition provision requires is that the claimant have taken prescribed medicine for a sickness or injury during the pre-existing time frame; if that is proven, the clause does not also require that the claimant have seen a physician for the condition for which he/she was taking prescribed medicine during the "pre-ex" period and/or that the claimant be specifically diagnosed with the condition during that time period.  Thus, the fact that Dr. Marlowe, the physician who prescribed Zoloft for Cummins, or any of his other treating physicians did not see him during the "pre-ex period" is not dispositive of whether the "pre-ex" provision applies.  In other words, under the plain language of the "pre-ex" provision, Unum did not necessarily need to know the status or severity of Cummins' sickness or condition during the pre-ex period, as plaintiff contends, as long as there was evidence that Cummins was taking a prescribed medication for a condition during that time period and that condition later caused or contributed to Cummins' disability.

[21] The Court agrees with Unum that plaintiff's reliance upon *Vander Pas v. Unum Life Insurance Co. of America*, 7 F.Supp.2d 1011 (E.D. Wis. 1998) is misplaced, as the facts in that case are distinguishable from the present matter.  In *Vander Pas*, the administrator, Unum, argued that the medication of Coumadin itself was the "pre-existing" condition which caused the insured's disability of subdural hematoma.  Unum was not arguing that the underlying condition which caused the insured to take the Coumadin, *i.e.*, atrial fibrillation, was the cause of the insured's disability.  *Id.*, at 1018.  The court in *Vander Pas* found that Unum failed to prove that the "pre-existing condition" clause (which is similar to the one at issue in this case) applied because the medication of Coumadin itself did not constitute a "sickness" or "injury" under that clause.  The court further found that Unum failed to offer any reasoning, proximate cause analysis, or extrinsic evidence demonstrating how it arrived at the conclusion that

23

With regard to whether Cummins' pre-existing condition of depression caused or contributed to his disability of cognitive decline, the medical opinions are split.   As discussed above, Cummins' treating physician, Dr. Osterberger, did not mention depression as a cause of Cummins' cognitive decline, and Dr. Bolter, after conducting his February 2002 neuropsychological evaluation, found it "difficult to articulate to what extent things would improve from a cognitive perspective if [Cummins'] depression and anxiety were under better control," suggesting that at least initially he believed Cummins' depression contributed to some degree to his cognitive symptoms, with the extent being uncertain.   Later, after Unum's initial denial of disability benefits on the ground that there had not been any information provided showing that Cummins' cognitive problems were due to some other cause than HIV or depression and no additional testing had been performed, Cummins' treating physicians, Dr. Zuckerman and Dr. Bolter, opined that depression was not the cause of Cummins' cognitive decline as his depression had been resolving in response to medication and psychotherapy, and they attributed Cummins'

Coumadin was a "pre-existing" condition under the policy.  In sum, the court concluded that the proposition that Coumadin played a part in causing the plaintiff's subdural hematoma is not equivalent to a "studied conclusion" that the plaintiff's use of Coumadin satisfies the definition for a "pre-existing condition," or that his disability was "caused by, contributed to by, or result[ed] from" the use of Coumadin.  *Id.*

In the present case, Unum is not contending that Cummins' disability of cognitive decline was caused by the medication of Zoloft itself; instead, it is contending that the underlying condition for which Cummins took Zoloft, *i.e.*, depression, caused or contributed to Cummins' cognitive decline.  Thus, Unum need not set forth the type of causal analysis required in *Vander Pas* linking the medication Zoloft to Cummins' disability.  Instead, the Court must evaluate whether Unum has presented sufficient evidence demonstrating a causal link between Cummins' "pre-existing" condition of depression and his disability of cognitive decline.

[22] While the independent medical examiner, Dr. Wolf, indicated in her report that Cummins was not treated during the "pre-ex" period for a condition that caused/contributed to his disability, it appears that, when she made that statement, she was considering cognitive decline as the "pre-existing" condition rather than depression, as she discusses the fact that there is "no mention of cognitive decline during the pre-ex period" and that Cummins had "no history of memory issues and no records of any neurologist visits in 2001."

24

cognitive decline to a degenerative process or, as Dr. Bolter hypothesized, a childhood head trauma.

By contrast, Unum's in-house neuropsychologist, Dr. Van De Mark concluded, based upon a review of the file and raw test data from Dr. Bolter's 2002 neuropsychological evaluation,  that Cummins' "extreme degree of elevation for depression and anxiety" was "certain to affect" his cognitive functioning and discredited the childhood trauma hypothesis, finding it likely that Cummins' cognitive complaints would improve with better control of his depression and anxiety.  The other on-site neurologist which Unum had review the file, Dr. Neuren, also concluded that among the several factors contributing to Cummins' cognitive decline was underlying characterological problems such as depression and anxiety.

Finally, during the reassessment process, Dr. Zuckerman indicated that he had no definitive diagnosis for Cummins' cognitive disturbance other than that there was "no indication of any HIV or other infectious etiology" causing Cummins' symptoms.  Dr. Bolter likewise indicated, at one point, that the cause of Cummins' cognitive deficits is "unknown." However, when explaining the results of the 2004 neuropsychological evaluation to Cummins, Dr. Bolter noted that the tests reflected improvement in Cummins' "affective functioning," meaning his depression was under "greater control and not producing a more generalized depressive effect;" but Cummins still had persistent deficits which Dr. Bolter found were characteristic of an underlying dysfunction that "may very well be a progressive decline with advancing age."  UPCL-POST RSA 00085-86.

The independent medical examiner that reviewed Cummins' file, Dr. Wolf, only opined that the medication, Zoloft, which was taken by Cummins during the "pre ex" period, did not cause his cognitive decline; she expressed no opinion as to whether the condition

25

of depression itself, for which he was taking the Zoloft, caused or contributed to his cognitive decline.  Finally, Dr. Spica, another in-house clinical neuropsychologist who reviewed the file during the reassessment process and upon which Unum primarily relies in its motion for summary judgment, found it reasonable to conclude that Cummins was treated during the pre-ex period for depression, a condition which contributed to his cognitive dysfunction.  In reaching that conclusion, Dr. Spica reviewed the entire file, including the raw data from Dr. Bolter's February 26, 2002 neuropsychological evaluation, and compared the results of Cummins' 2002 and 2004 neuropsychological tests.[23]  He specifically referenced in his report Dr. Bolter's statements in his February 26, 2002 report that Cummins had a "marked degree of depression and anxiety, which [was] both interfering with his ability to function from day to day as well as his ability to tolerate even routine stressors" and that it was difficult to articulate to what extent Cummins' cognitive symptoms would improve if his depression and anxiety were under better control.

Dr. Spica also pointed out that, in Dr. Bolter's March 2004 neuropsychological evaluation, he noted Cummins was "much less depressed and seem[ed] to be on the rebound emotionally with regard to what was evidenced two years ago;" however, "persistent depressive and anxiety related symptoms" were nevertheless noted to exist. Although Dr. Spica was not provided with the raw data from the March 2004 evaluation, he reviewed a table of scores related to that examination provided by Dr. Bolter, which reflected that Cummins still had a depression index in the 96th percentile in 2004 (compared >99th percentile in 2002) and a conversion hysteria score in >99th percentile (which was

---

[23] Dr. Spica indicated that he was unable to review the raw data from Dr. Bolter's March 9, 2004 neurological testing of Cummins because Dr. Bolter had not provided that information to Unum.

the same as his 2002 score).  Dr. Bolter found such factors to be contrary to Dr. Bolter's statement in the March 2004 report that "clearly, emotional factors are no longer intruding to [Cummins'] persistent cognitive problems noted above."  Dr. Spica also points out that Cummins demonstrated improvements in many areas of cognition during the March 2004 evaluation as compared to his February 2002 evaluation (*i.e.*, his intellectual level rose from the 21st percentile to the 55th percentile), and his standardized spelling test improved from the 50th percentile to the 79th percentile, which is "remarkable as spelling skill is typically not susceptible to decrement from genuine acquired cognitive dysfunction").[24]  Based upon that information, Dr. Spica concluded Cummins had demonstrated some improvement in his cognition commensurate with his improvement in depression, suggesting that his depression at least contributed to his cognitive dysfunction.

Considering that the independent medical examiner in this case did not render an opinion as to whether the condition of depression caused and/or contributed to Cummins' cognitive decline, Unum's benefits determination came down to a decision between the differing opinions of Cummins' treating physicians and those of Unum's in-house consultants.  Generally, when an ERISA plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to benefits, the administrator's decision cannot be said to have been arbitrary and capricious where the administrator can offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.  *Evans v. Unumprovident Corp.*, 434 F.3d

---

[24] Dr. Spica also attributes Cummins' neurocognitive weaknesses to his symptom exaggeration to some extent; however, since symptom exaggeration is not the basis upon which Unum denied benefits, the Court need not examine that conclusion further.

866 (6th Cir. 2006).  Unlike the mandatory deference accorded to treating physicians in Social Security cases, the United States Supreme Court has held that, in the ERISA context, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's [treating] physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).  The Supreme Court nonetheless admonished that "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Id.*  Here, the record reflects that Unum and its in-house physicians considered Cummins' treating physicians' diagnoses and opinions through several levels of appellate review and a reassessment process; however, Unum elected not to, and was not required to, give those opinions "determinative weight" nor was it required to explain why it credited the opinions of its on-site physicians over those of Cummins' treating physicians.  *Doty v. Sun Life Assur. Co. of Canada*, 2007 WL 1239219 (S.D. Tex. 2007).[25]

Furthermore, it appears that Unum reached its benefits decision through a reasoned process based upon "at least some concrete evidence in the record" and that it explained that reasoning process to Cummins in each of its denial letters, with the most expansive explanation being contained in its final letter to Cummins dated October 10, 2006.  In that letter, Unum provided a five-page summary of the medical evidence, with particular focus

---

[25] *Dowdy v. Hartford Life & Acc. Ins. Co.*, 458 F.Supp.2d 289, 303-304 (S.D. Miss. 2006)("[A] dispute in the record among medical professionals . . . is not enough for this court to conclude that [a plan administrator] lacked substantial evidence to support its determination").

on the most recent conclusions of Dr. Spica.  It pointed out that Dr. Spica's opinions, which were based upon a comparison of the raw data from Cummins' 2002 neuropsychological evaluation and the results of his 2004 evaluation, indicated that Cummins had "demonstrated some improvement in his cognition, commensurate with his improvement in depression," and such evidence and conclusion, along with the opinions of its other on-site physicians, supported its decision that Cummins' cognitive difficulties were caused, contributed to, or resulted from his depression/anxiety, for which he received prescribed medication during the "pre-ex" period.

While Unum was not required to explain why it did not rely upon the opinions of Cummins' treating physicians, it explained that it elected not to do so because they changed their position as to whether Cummins' cognitive decline was caused by depression after Unum denied him benefits on that ground.  While Dr. Bolter did not indicate in his initial opinion that depression was "the cause" of Cummins' cognitive decline, his opinion that Cummins' cognitive symptoms might improve to some extent with better control of his depression suggests that, at one time, Dr. Bolter thought that Cummins' depression contributed to his cognitive symptoms at least to some degree.  Furthermore, even after the benefits denial, Dr. Bolter's opinion was that Cummins' cognitive decline did not appear to be "directly related" to his depression, a conclusion which leaves room for the inference that depression could still be an indirect, contributing factor to Cummins' cognitive symptoms.[26]  Considering that Dr. Bolter's opinion as to the exact cause of Cummins'

---

[26] In addition, in his February 6, 2003 letter, Dr. Zuckerman simply stated that depression was the "root cause" of Cummins' dementia, and even Cummins admits, in his summary judgment motion, that such language means that "depression is not likely to be the cause."  This also leaves room for interpretation that, while depression may not be the cause of Cummins' dementia, it could nevertheless be a contributed factor.  UPCL 00097; Cummins' motion, p. 17.

cognitive decline ranged from "unknown" to a hypothesized brain injury or systemic illness

and that he never completely ruled out depression as an indirect, contributing factor; that

Dr. Wolf expressed no opinion as to whether depression caused Cummins' cognitive

decline; and all of Unum's on-site physicians concluded that depression was a "cause" or

"contributing factor" to Cummins' disability, the Court finds that Unum's benefits denial on

that ground cannot be considered arbitrary and capricious.[27]   Moreover, the fact that

---

[27] The Court finds that the cases relied upon by Cummins, relating to the level of proof of the causal link between the pre-existing condition and the disability, are distinguishable.  First, in *Fought v. Unum*, 379 F.3d 997 (10th Cir. 2004), the court elected to apply a standard of review which was even more heightened than the one being applied in the present case because it found not only an inherent conflict of interest based upon Unum's status as the administrator and payor of claims but also a "serious procedural irregularity," in that Unum had persistently resisted discovery as to the extent of its conflict of interest and denied the claimant's benefits claim "in a complicated set of circumstances without seeking independent review."  Furthermore, the pre-existing condition clause in *Fought* was broader than the one in the present case, and the Court found that Unum's reliance upon "classic but/for causation" in linking the alleged pre-existing condition to the disability was inappropriate.  Specifically, in *Fought*, Unum's argument for the exclusion of benefits required  "five intervening stages" between the claimant's pre-existing coronary artery disease and her claimed disability, which was caused by a staph infection:  (1) the failure of non-surgical alternatives to treat the pre-existing condition of coronary artery disease; (2) initially successful elective surgery to treat that condition; (3) complications from that surgery; (4) initially successful treatment of those complications; and (5) a drug-resistant infection due to those complications, which in itself may have been caused by the intervening presence of staphylococcus aureus due to faulty sterilization, sanitation, etc. Given this attenuated chain of causation, the Court found that the claimed disability, which resulted from staph infection, was a "separate and distinct injury" and not a manifestation of the underlying coronary disease and that Unum failed to demonstrate that the disabling condition was "substantially or directly attributable to the pre-existing condition."  By contrast, in the present case, Unum has presented no such attenuated chain of "but/for" causation.  Instead, Unum has pointed to a prescribed medication which Cummins took during the pre-existing period, as required by the pre-existing condition provision.  It has presented undisputed evidence that such medication is used to treat depression, and it has presented some concrete evidence, even if disputed, that the condition of depression directly contributed to Cummins' disability of cognitive decline.  Unum need not prove such causal link by undisputed evidence. *See, Vega*, at 299.  In short, unlike the scenario in *Fought*, Unum has presented a causal scenario in the present case where it denied benefits for cognitive decline *resulting*, at least in part, from depression, not for cognitive decline resulting from *treatment or surgery* for depression (*i.e.*, not cognitive decline resulting from the use of Zoloft, which would require more extensive proof of causation, as discussed above in *Vander Pas*).

    The other case cited by Cummins, *Glista v. Unum*, 378 F.3d 113 (1st Cir. 2004), is likewise distinguishable because the pre-ex provision in that case was broader and because the court considered the plan administrator's internal memoranda and training materials (which defined the benefit terms and provided the standard for evaluation of the facts presented) in determining whether the administrator sufficiently established the causal link between treatment during the pre-ex period and the disabling condition.  Those materials provided that the pre-ex clause applied only where there was a "clear and direct relationship between the symptoms and treatment in the pre-ex period and the disabling condition."  However, in the present case, none of Unum's internal documents or training manuals concerning

Cummins was awarded social security disability benefits does not suggest an abuse of discretion because social security does not include a pre-existing condition exclusion provision, as Cummins' policy with Unum included.[28]   Accordingly, the Court finds that summary judgment should be granted in Unum's favor, upholding its benefits determination.

---

interpretation of the pre-ex provision are in the administrative record.  Thus, the Court cannot rely upon those documents to define the terms in the pre-ex clause and to determine the standard Unum must meet in proving causation.  The Court can only rely upon the plain meaning of the terms contained in the clause. Webster's II New Riverside University Dictionary 239 (1988) defines "cause" as "[s]omething that produces an effect, result or consequence."  The term, "contributed," is defined broadly as "[t]o act as a determining factor," and the term, "results" means "to happen or exist as a result of a cause."  *Id.*, at 306, 1002.  With these definitions in mind, the Court finds that Unum has produced enough concrete evidence that Cummins' depression was a determining factor relative to his cognitive dysfunction, even if the extent of its effect is unknown.

[28] Although Cummins contends that Unum acted in an arbitrary and capricious fashion because it never abandoned the argument that HIV+ was a pre-existing condition under the policy, despite all of the medical opinions indicating that HIV+ was not the cause of Cummins' cognitive decline, the Court finds such argument to be irrelevant, considering that, in all of Unum's denial letters, it also made reference to depression as another "pre-existing condition" for which benefits were being denied.

Cummins also argues that certain findings during Dr. Bolter's 2004 neuropsychological evaluation, such as left-sided motor and sensory deficits, support Cummins' theory that the cause of his cognitive decline is organic; however, even assuming that is true, such information does not rule out the other evidence indicating that Cummins' depression was at least a "contributing factor" to his cognitive symptoms.

31

## <u>RECOMMENDATION</u>

For the above reasons, it is recommended that the Cross-Motion for Final Judgment on the Merits of the Case (R. Doc. 72) filed by defendant, Unum Life Insurance Company be **GRANTED**, upholding Unum's benefits decision, and that the Motion for Summary Judgment on the Merits (R. Doc. 76) filed by plaintiff, Charles David Cummins, be **DENIED**.

Signed in chambers in Baton Rouge, Louisiana, August 23, 2007.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

32